In the matter of the appeal from the decree of the orphans court of the county of Passaic, admitting to probate a certain paper-writing as the last will and testament of DWIGHT ASHLEY, deceased.

[Decided February 16th, 1928.]

1. Letters and a diary belonging to the testator, containing reflections on his sons, beneficiaries under his will are admissible in evidence upon the probate of the will as bearing on the condition of the testators mind with reference to the objects of his bounty.

2. On the evidence in this case, the testator was competent when he made his will, and was not unduly influenced.

On appeal from the Passaic county orphans court.

*Mr. Arthur T. Vanderbilt*, for the caveators.

*Mr. William B. Gourley*, for the proponent.

LEWIS, VICE-ORDINARY.

This is an appeal from the orphans court of Passaic county, admitting to probate the last will and codicil of Dwight Ashley, who died in the city of Paterson, New Jersey, on February 21st, 1925. In the orphans court both the will and codicil were attacked, but before me the controversy was over the codicil. No written opinion was filed in the orphans court, but Judge Delaney, who sat therein, had this to say at the close of the case for the caveators:

"I am not disposed to continue this matter. As the matter rests there is nothing before the court that would, under any circumstances, justify the court in refusing to admit this will to probate—absolutely no evidence to justify the court to conclude there was any undue influence and nothing to justify the court to conclude there was any impropriety or that the execution of the will was not in conformity with the stat-

utes, and, that being so, I don't feel justified in taking up any more time, and will order the will be admitted to probate."

Dwight Ashley executed his will April 28th, 1924, and the codicil on January 9th, 1925. He was seventy-seven years of age at the time of his death. By the terms of his will he devised all his property to his executors in trust, to pay his wife one thousand dollars ($1,000) a year for life, and after five years equally to his three children, Dwight Ashley, Jr., Charles E. Ashley and Irving D. Ashley. In the codicil he bequeathed one hundred and forty (140) shares of the Savoy Realty Company, Incorporated, to his oldest son, Dwight Ashley. Under the will Charles and Irving would have controlled the Savoy company. It is quite evident, from the examination of the testimony and exhibits, that the testator was afraid to trust them to manage this company.

He enjoyed very good health during the greater part of his life and had no serious illness until the stroke which he suffered some time prior to his death. The testimony of the physicians who attended him is that his mind, after the stroke, was keen and clear, save for a day or two immediately following it. Doctors Todd and Flitcroft, two well known physicians of the city of Paterson of high standing, gave such evidence. Doctor Flitcroft appeared as a witness for the caveators. He says he saw the testator on February 8th, 12th, 18th and 20th, a month after the execution of the codicil, and that "he held his own until the last." Doctor Todd, in his evidence, says that the testator was confused a day or two after his stroke in August, but that after he was perfectly clear. Dr. David S. Hamilton, of St. Paul's Church, Paterson, called upon the testator shortly before his death, and in the month of February, 1925, and describes his conversation with him as "a fine talk," and that he was as reasonable as any man. Relatives, and others who came in contact with him in his latter days, testified to the same effect.

This unfortunate controversy over the disposition of the estate arises without doubt from the bitter and unfriendly feeling existing among the sons of the testator. Two sons, Charles and Irving, have been, and are, arrayed, against their

brother, Dwight Ashley.   The widow makes no attack. Dwight Ashley was a well known citizen of Paterson, being engaged in the silk business for many years there.   He was of strong and vigorous mind.   He began his career at the "bottom of the ladder" and became one of the most successful men in the industry.   He at one time had amassed a large fortune, but this had decreased before his death.   He had the "ups and downs" that most men experience in a business of this character so largely dependent upon fashion.   He dealt most generously with his sons, as is disclosed by the various transactions between them shown by the evidence.   The testator died at the home of his son Dwight, and the attempt is made by Dwight brothers, Irving and Charles, to show that the codicil was the result of undue influence exercised by their brother Dwight.   Irving saw him frequently at Dwight's home, and, in fact, on the morning of the day of his death. It is true that the letters and diary, which the testator left, contained reflections upon the son Dwight, as well as the other sons.   They were admitted in evidence by me "as bearing upon the condition of the testator's mind with reference to the objects of his bounty." *Cooper's Will, 75 N. J. Eq. 177,* and other cases cited therein.   Despite these reflections the son Dwight appears to have conducted himself in life so as to awaken the confidence of his father.   Particularly is this true in the latter days, for it was to his home that the testator went to make his final earthly abode.   Here his wife, with whom he had not lived as man and wife for many years, dwelt, his son Dwight having provided a home there for her.   May not the fact that the son Dwight was providing this home for his mother have convinced his father that he was the proper one to take charge of the Savoy company's affairs, which is alleged to be one of the principal assets of his estate?   Dwight's home, as a place of abode, was the testator's own selection. The testimony reveals that he was dissatisfied with the conduct of Charles and Irving, and that they both had serious matrimonial difficulties which not only disturbed him but awakened his criticism.   Charles did not speak to his father for nine years.   He evidently was very fond of Irving, and, at

various times, advanced large sums of money to him and paid off heavy financial obligations which he had incurred. Referring to Charles and Irving, the housekeeper on the testator's farm, on which he lived before going to Dwight's home, offers important and illuminating testimony as to the testator's concern about them. She says on cross-examination:

"*Q.* You spoke of some conduct he didn't like. What conduct—whose conduct did he speak of?

"*A.* The two boys.

"*Q.* Which two?

"*A.* Charles and Irving.

"*Q.* What did he say Charles and Irving had done?

"*A.* He didn't like their drinking.

"*Q.* Did he say anything about what the result would be if they kept on drinking?

"*A.* He says my boys will go to hell if they don't stop."

The selection of his son Dwight's home it would appear, therefore, was a natural one. This son was living a well-ordered life with his family. It was a sort of haven of rest after a long and sometimes stormy career. He had plenty of opportunity while there for independent advice and frequently saw people. In both the making of his will and codicil he had counsel. The witnesses to the same were independent and all the formalities requisite to their due execution seem to have been complied with.

It developed, during the progress of the case and very near its close, that the testator, after the execution of the codicil, had transferred to his son Dwight as a gift the one hundred and forty (140) shares of the Savoy Realty Company, Incorporated, stock which he had bequeathed to him by the terms of the codicil. The endorsement on the certificate was in the handwriting of the testator and it was delivered to the son. This appears to have been a gift *inter vivos,* and if I had held it to be good at the time the certificate was produced, there would have been no reason to proceed further with this case as this is the only property disposed of by the codicil. Slight evidence, however, was offered as to the facts relative to, or circumstances surrounding the gift, and, in my opinion, it would

be unjust for the court to extract from the case presented—
pleadings and evidence—an entirely new case which had not
been tried, and, therefore, I pass it now without further com-
ment.

Considerable testimony was introduced relative to the stock
holdings and the stock transactions of the various companies
organized or financed by the testator and in which he and his
sons were interested from time to time, some of it of little
evidential value in a litigation of this nature, but none of it
has changed my view of the controversy.

I am satisfied that the testator was competent and that
there was no undue influence exercised.

The decree of the orphans court should be affirmed.